IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | | |
|---|---|---|
| CLAIRE LAROCHE, | : | Civil No. 21-13918 (RBK/AMD) |
| Plaintiff, | : | |
| v. | : | |
| ANDREW BURKI, | : | |
| Defendant. | : | |

**DEFENDANT'S TRIAL BRIEF**

Dated: October 24, 2023

Respectfully submitted,
*/s/David W. Sufrin*
David W. Sufrin, Esq., 031281995
ZUCKER STEINBERFG & WIXTED, P.A.
415 Federal Street
Camden, New Jersey 08103
(856) 365-0080
*Counsel for Defendant*

**Factual Background**

Andrew Burki (Defendant) and Claire Laroche (Plaintiff) were mother and son in law. Defendant was married to L.B., plaintiff's daughter, until June of 2022, when the Hon. Judith S. Charny, J.S.C. granted a divorce and entered an Order – unchanged to this date - that gave defendant sole custody over his son – plaintiff's grandson – then four year old S.B. The Order also barred the child from having any contact with the plaintiff pending further Order.

Before he filed for divorce, in January of 2020, defendant was travelling for his job - lecturing in Florida and Washington D.C. as a preeminent drug and alcohol recovery expert. Years earlier, his father (now a Swiss citizen) was relocating permanently to Switzerland in 2017 and brought a hunting rifle to defendant's and L.B.'s Collingswood home. L.B. told defendant she was concerned about having a rifle in their home with a newborn, and she noted she would take the rifle to her parents' home in Farmville, Virginia, since her parents were, according to both parties, gun owners. Andrew never saw rifle again, which was in a wooden box that L.B. acknowledged she never knew existed before she found it on January 31, 2020, when her sister (Julia LaRoche) took the train from Manhattan and made a video recording of their search and discovery for the gun. For his part, defendant had assumed the rifle was in Virginia, just as his wife said, after which he never saw the box or the rifle again.

On or before February 3, 2020 plaintiff travelled to New Jersey and called the gun in to the Collingswood police department. On February 4, 2020, the plaintiff and her daughter also travelled to the Camden County Courthouse, where plaintiff assisted her daughter in obtaining a Temporary Restraining Order from the Hon. Yolanda Rodriguez, JSC. That Order was eventually finalized on February 24, 2020 by the Hon. Angelo DiCamillo, who actually had to

eject the plaintiff from his courtroom after she attempted to insert herself into the proceedings. Plaintiff also inserted herself into the TRO hearing almost a month earlier.  A series of text messages were introduced that plaintiff encouraged and instructed her daughter what charges to file and how to proceed with the restraining order and criminal process against the defendant while he was away on business.  For nearly a year, the defendant could not see or talk to his son, except on daily zoom calls after he was finally released from the Camden County Jail.  During those zoom calls, L.B. coopted the child's conversations with his father, and taunted him, engaged in all sorts of conversations, admitted she and her mother "orchestrated" the gun charges and conceded she was never raped – that she just wanted custody and knew New Jersey was a hard state to prevail.  Hours of recorded calls, after the restraining order was in place, demonstrate a glib, sadistic often hysterical L.B. mocking, threatening and seeking reassurance and support from the defendant.  During those conversations, many of which plaintiff admitted she overheard, L.B. expressed nether fear or concern over the defendant, and engaged in hours upon house of unsolicited contact and conversation.  IT was during those calls, we contend that defendant was able to obtain a series of exculpatory statements from L.B. that eliminated any possibility he either raped her or had a gun in the house.  At one point, L.B. noted during a zoom call with glee the irony that defendant was "so anti-gun" during their relationship.

    Mr. Burki published two statements in an effort to exonerate himself, after a series of local and online newspaper and publications referred to his arrest as a prominent recovery expert arrested on rape and firearms charges.  He reasonably believed his published statements were true.  He still does.  His reasonable belief was based on the admissions from his wife, excerpts of the grand jury testimony about what his wife said, L.B.'s statements to police, the recorded video of L.B. and her sister "discovering" the rifle, and statements made at his detention hearing for

most of which the plaintiff was present in court.  He asserts that he knew the rifle was not in his home, and he asserts that plaintiff, in alliance with her two daughters, arranged for the transport and placement of the rifle in his house in a location he knew it had not been,  His statements were objectively as well as subjectively true, and we respectfully urge that the plaintiff cannot prove that they were false.

After Mr. Burki finally began to have unsupervised visit with S.B., plaintiff determined it would be appropriate on more than one occasion to sew a USB wiretap device into her then four year old grandson's clothing. She also is heard on those recordings as she discussed a second recording device.  At no time during those recorded conversations, did plaintiff evidence a concern or discussion about her grandson's safety.  In fact, plaintiff was glib, unconcerned and otherwise giddy about her use of the wiretap device.  During those recordings plaintiff is heard as she emotionally tortures her grandson about a book his father purchased for him that day, telling the child his eyes would bleed if he read it, and laughing after the child threw it in the trash.  Those recordings belie the state reasons for using a recording device stated by the plaintiff.  Plaintiff then sent her grandson to retrieve the device, after which a hysterical child was videotaped searching for it at the request of his beloved "Grand," refuting large sections of her sworn previous testimony in the family court.

## LEGAL ISSUES

We rely on the proposed jury instructions sent under separate cover, as well as the reasons set forth in our separate responses to plaintiff's two in limine applications.

### Hearsay

We disagree that the out of court recordings of zoom calls between defendant and L.B. are inadmissible.  They relate to Mr. Burki's state of mind and reasonable belief in the truth of

what he claimed, as well as his absence of malice or willfulness that has been repeatedly alleged by plaintiff, who seeks to characterize the defendant as a physically abusive menace with a long history of abuse – none of which is accurate or supported by her previously sworn testimony during the parties' divorce trial.  They are relevant and material evidence of his state of mind, as well as the truth and non-falsity of his statements.

Liz Burki eventually admitted on a video recorded zoom all that she, the plaintiff (her mother) and Sara Babaa "orchestrated" the gun, after Andrew noted she testified she had no idea about the gun in the house.  She also noted that all of their sexual relations were consensual, despite the fact her mother (plaintiff) encouraged her to file rape and gun charges against him. Among admissions, L.B. said she was aware it would be hard to get custody in New Jersey, she wanted to move to Virginia and everyone was telling her that she was raped – but she told police their sexual encounters were consensual.  Mr. Burki was charged with first degree rape and firearms violations for a gun he never knew was in his house, and or false rape allegations - charges that resulted in his detention for more than three months.  He was eventually released in April of 2020, after prosecutors agreed to dismiss all the charges in exchange for his agreement to plead to fourth degree, non-sexual, non-violent coercion.

### **Public vs. Private Defamation**

We respectfully assert this the statements at issue involve public, and not private defamation, as those terms are defined.  In defense of plaintiff's defamation claim, Mr. Burki's reasonable or honest belief in the truth of his statements is both relevant and admissible. LoBiondo v. Schwartz, 199 N.J. 62, 90-93 (2009). "Evaluation of content involves consideration not merely of a statement's literal meaning, but also of the fair and natural meaning that reasonable people of ordinary intelligence would give it." Gulrajaney v. Petricha, 381 N.J.Super.

241 (App.Div.2005). And, to the extent plaintiff, a distinguished college professor, lawyer and published author and international lecturer (her impressive resume appears in the first several paragraphs of her Complaint) is a public figure or a limited-purpose public figure (or if Mr. Burki's statement was touching upon a matter of public concern, to wit: his highly-publicized arrest, plea and conviction during which the plaintiff appeared at every stage in the proceedings. Fortenbaugh v. New Jersey Press, Inc., 317 N.J.Super. 439, 455 (App.Div.1999)(discussion of whether *college professor* is a public figure or limited-purpose public figure); W.J.A. v. D.A., 210 N.J. 229 (2012); Senna v. Florimont, 196 N.J. 469 (2008); see also Durando v. Nutley Sun, 209 N.J. 235 (2012). These characteristics, we argue, require the plaintiff to prove actual malice, again making Mr. Burki's state of mind once again relevant and material, and therefore the information in the videos with his ex-wife the source of that information. New York Times Co. v. Sullivan, 376 U.S. 254, 279, 84 S. Ct. 710, 726, 11L. Ed. 2d 686, 706 (1964). Any information Mr. Burki reasonably or honestly believed about plaintiff when he posted the alleged remarks and the video, including admissions by plaintiff's daughter that she and her mother "orchestrated" the gun are relevant and material to the jury's determination, as well as his defense. See, e.g. Gertz v. Welch, 418 U.S. 323, 345, 94 S. Ct. 2997, 3009, 41 L. Ed. 2d 789, 808 (1974); Hill v. Evening News Co., 314 N.J.Super. 545, 554-55 (App.Div.1998); Verna v. The Links at Valley Brook Neighborhood Ass'n, Inc., 371 N.J.Super. 77, 97, 852 A.2d 202 (App.Div.2004)(discussion of limited purpose public figure), It may also be relevant to the credibility of hie wiretap claim, as well as the plaintiff's defenses

Moreover, defendant's statements touched upon a matter of legitimate public concern, to wit: his highly publicized arrest, indictment and false allegations that he raped his wife and had an assault rifle in his home. His comments were designed to exonerate himself – and plaintiff

was personally or virtually present in the courtroom during most if not all of those proceedings connected to his arrest, the restraining order and his detention and plea/sentence. WE urge this case involved public and not private defamation, though in either instance, defendant's state of mind is relevant to malice, willfulness and his honest belief in the truth of what he published.

<u>Justification/Exception to State and Federal wiretap laws.</u>

We respectfully argue that no justification exists in the caselaw. Neither statute has an exception that justifies plaintiff's decision to sew a listening/recording device into a four year old chid's overalls (and a second one in his backpack), and then send that child out of the home to record third party conversations. The "transferred intent" discussed does not apply here, and the cases that plaintiff relies on are factually and legally distinguishable. The recordings on the USB device, despite plaintiff's "spoliation" argument applies to the weight, and not the admissibility of those recordings – recordings which flatly refute her claims of concern that her grandson was being abused, all in her own calm and dispassionate voice. They must be heard by the jury – especially considering the plaintiff's intended argument she was justified under the Appellate Division's <u>D'Onofrio</u> decision. Those recordings refute her claimed basis for concern.

We **disagree** with plaintiff's view of the caselaw interpreting her liability and the exceptions to State and Federal wiretap laws on the basis she was somehow protecting her grandson.[1]

---

1 *See* N.J.S.A. 2A:156A-2, 4, 24; 18 U.S.C. §§ 2510-11, 2520; *Hornberger v. Am. Broad. Cos., Inc.*, 799 A.2d 566, 590-92, 595 (App. Div. 2002); *PBA Loc. No. 38 v. Woodbridge Police Dep't*, 832 F. Supp. 808, 818 (D.N.J. 1993); *D'Onofrio v. D'Onofrio*, 780 A.2d 593, 596–98 (App. Div. 2001); *Cacciarelli v. Boniface*, 737 A.2d 1170, 1173 (Ch. Div. 1999); *Commonwealth. v. F.W.*, 986 N.E.2d 868 (Mass. 2013); *Pollock v. Pollock*, 154 F.3d 601, 609 (6th Cir. 1998) (citing *State v. Diaz*, 308 N.J.Super. 504, 706 A.2d 264 (1998)) ("In *State v. Diaz* . . ., the court held that parents could vicariously consent on behalf of their five-month-old infant to recording a nanny abusing the child on videotape, under New Jersey's version of the federal wiretap act. The Court in *Diaz* noted that the New Jersey statute was modeled after the federal statute, and cited Thompson and the district court's opinion in this case in support of its holding that the state statute incorporates the theory of vicarious consent").

We assert that defendant is entitled to recover damages from ~~plaintiff~~ Claire LaRoche for violating New Jersey and Federal Wiretap Laws, without exception, which does not appear in either Federal or State statute.  Plaintiff's reliance on D'Onofrio v. D'Onofio, 344 N.J.Super. 147 (App.Div.2001) and State v. Diaz, 308 N.J.Super. 504 (App.Div.1998) is totally misplaced.  Both cases are factually distinguishable and provide no cover to plaintiff in this instance.  Each of those cases limited their holdings to the use of a wiretap device (consisting of recorded telephone conversations) "*in his or her home"* and each court *very carefully* noted that their holdings were limited to factual circumstances that occur *in the home*.  D'Onofrio at 155; Diaz at 514.  Both cases involved telephone calls that came into and out of the home – a specifically limited exception.  Here, the plaintiff sent her grandson out of her home into the world with *two* recording devices and on two separate occasions, both instances of which were designed by her to intercept communications between Mr. Burki and other in his private residence or during his private interactions with third parties – all of which took place *outside* their home.  Surely the Appellate Division in D'Onofrio never intended its decision to permit parents to "bug" their young children outside the home as such a permissive inference would seriously endanger young children in almost any instance in which the device might be discovered by the other parent.  *D'Onofrio involved phone conversations inside the house where the device was located, and took place only after an initial conversation was accidentally overheard.  None of those conditions are at issue here.*  Plaintiff should not be permitted to present testimony about her justification or reason she sewed a wire into her grandson's clothing.  And if she really believed she was justified, why is she heard on the device conspiring with her daughter to lie to the court about who did it?  Such misbehavior was *never* contemplated by the Appellate Division in either D'Onofio or Diaz.  And to further distinguish these cases, plaintiff was neither the child's parent

or guardian, and therefore she could not have vicariously consented for her grandson. D'Onofrio at 154-156. We respectfully object to the remainder of the proffered instruction unless the Court rules the exception applies, in which case those exceptions should be limited to whatever facts are established during the trial.

          Respectfully submitted,

          */s/ David W. Sufrin*
          David W. Sufrin, Esq. 031281995
          ZUCKER STEINBERG & WIXTED, P.A.
          415 Federal Street
          Camden, New Jersey 08103
          *Attorneys for Andrew Burki*